UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| NEIL SCALA,<br>Plaintiff,<br><br>v.<br><br>AMERICAN AIRLINES, INC.,<br>Defendant. | ) | C.A. NO: 302cv:00755(MRK) |

**DEFENDANT, AMERICAN AIRLINES, INC.'S STATEMENT OF MATERIAL AND UNDISPUTED FACTS AND MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

This is an action for purported personal injuries allegedly sustained when plaintiff Neil Scala was provided a cranberry juice and vodka drink instead of a plain cranberry juice during a return international trip from Aruba to Connecticut. As plaintiff's action arise out of an incident aboard an international flight between Aruba and the United States it is governed exclusively by the Warsaw Convention. As set forth below, defendant American Airlines, Inc. ("American") is entitled to the entry of summary judgment as the undisputed material facts establish that American is entitled to judgment as a matter of law.

## STATEMENT OF MATERIAL AND UNDISPUTED FACTS[1]

Plaintiff, Neil Scala, was a passenger aboard American Airlines Flight No. 1566 between Aruba and Puerto Rico on December 15, 2000. Complaint (**Exhibit 1**).

The flight was part of a round trip between Aruba and Connecticut, where Mr. Scala resides. Id.

[1] The following facts are set forth as undisputed for purposes of this motion only.

Mr. Scala, a retiree, was returning with his wife from a time share they own in Aruba. Mr. Scala and his wife go to both Aruba for four weeks and St. Martin for four weeks each year and have been doing so since 1987. N. Scala depo. at 14-17 (**Exh. 2**); P. Scala depo. at 56, 6, 14 (**Exhibit 3**).

Mr. Scala is 68 years of age, and was 66 at the time of the alleged incident. N. Scala depo. at 5,9 (**Exh. 2**),

After arriving and staying in Aruba for four weeks, Mr. Scala boarded an American flight from Aruba to San Juan, Puerto Rico before connecting on another American flight from San Juan to Hartford, Connecticut. N. Scala depo. at 19-20 (**Exh. 2**).

Mr. Scala was sitting in business class next to his wife during the 55 minute return flight from Aruba to San Juan. N. Scala depo. at 34 (**Exh. 2**). He asserts he asked a flight attendant for a "cranberry juice." N. Scala depo. at 34-35 (**Exh. 2**).

Mr. Scala claims that the flight attendant went to the front of the cabin to the gallery and returned telling him they did not have any cranberry juice up front and that she would go get it out of coach. N. Scala depo. at 37-38 (**Exh. 2**). The flight attendant returned to Mr. Scala's seat shortly thereafter providing his wife a coke and Mr. Scala the drink. N. Scala depo. at 40. (**Exh. 2**). The drink was in a glass with ice and cranberry juice. N. Scala depo. at 40 (**Exh. 2**).

Mr. Scala claims he was hot and "dying of thirst" and took a "gulp". He states he took a "big mouthful." N. Scala depo. at 42. (**Exh. 2**).

Mr. Scala stated to the flight attendant "you put alcohol in here" to which the flight attendant purportedly apologized stating "I thought you ordered vodka and cranberry juice." Id. Mr. Scala told the flight attendant to get him some water so he

could "dilute this down." The flight attendant brought him a glass of water. N. Scala depo. at 43-44 (**Exh. 2**).

Mr. Scala claims that he subsequently turned bright red and broke into a sweat soaking through his clothes. N. Scala depo. at 46 (**Exh. 2**). He also "felt sick", had an "upset stomach," and was "burning up." Id. at 48 (**Exh. 2**).

After another 30 to 45 minutes, the plane landed in San Juan and Mr. Scala and his wife went to meet their scheduled connecting flight. Mr. Scala was no longer sweating but still had an upset stomach. N. Scala dep. at 50 (**Exh. 2**).

After being served the drink, Mr. Scala had no further contact and did not seek out any American personnel before boarding the connecting flight. N. Scala depo. at 51 (**Exh. 2**).

Mr. Scala waited an hour and a half before boarding the connecting flight. N. Scala depo. at 52 (**Exh. 2**).

Mr. Scala boarded the connecting flight to Connecticut and after another hour and a half Mr. Scala claims he started to get "angina", that his left arm started to hurt and he had trouble breathing. N. Scala depo. at 53-54 (**Exh. 2**).

Mr. Scala called a flight attendant and asked for oxygen which was provided. He was asked whether he wanted the flight to make an emergency landing but refused saying "get me into Hartford where all the heart doctors are." N. Scala depo. at 54, 60 (**Exh. 2**), further stating that Hartford was where his cardiologists were and where he had his heart operations. He also reported that he "had angina many a time and [previously] had arm pain." Id. at 61 (**Exh. 2**).

The flight attendant, at this time, asked whether there was any medical personnel on board and two passengers, who were EMT's responded. Mr. Scala initially thought he

might be having a heart attack. N. Scala depo. at 55-57 (**Exh. 2**). The EMT's took Mr. Scala's blood pressure and kept track of his pulse. Id. at 57 (**Exh. 2**).

Mr. Scala estimated he had the oxygen for about 45 minutes and further stated that the angina subsided but that his arm pain persisted. N. Scala depo. at 59 (**Exh. 2**).

He remained on the flight until it reached Hartford for the remaining 2 to 2 ½ hours. He ordered a meal but did not eat it due to his upset stomach. N. Scala depo. at 54-55 (**Exh. 2**).

At the time the plane arrived at Hartford Mr. Scala had an upset stomach and his left arm was hurting him. N. Scala depo. at 62-62 (**Exh. 2**). He did not ask for any assistance and did not seek out any medical attention. Id. at 62-63 (**Exh. 2**). The angina had resolved. Id. at 64 (**Exh. 2**). By the time he arrived home from the airport (25 minutes) he no longer had any arm pain. Id. at 65,66 (**Exh. 2**).

It was a Friday night when Mr. Scala returned home with his wife. P. Scala depo. at 44 (**Exh. 3**). Mr. Scala felt fine noting only that on Sunday after taking a walk felt "a little angina" and stopped. He went walking again on Monday and felt it again and had some shortness of breath. He drove himself to the hospital. N. Scala dep. at 70-73 (**Exh. 2**). Up until that time, Mr. Scala had no upset stomach, chest pain, arm pain or any shortness of breath. N. Scala depo. at 72 (**Exh. 2**).

Mr. Scala went to Mid-State Hospital and then was sent to St. Francis Hospital where he saw a Dr. Sappington and a catheterization was performed. N. Scala depo. at 74-75 (**Exh. 2**). Mr. Scala had had four or five catheterizations in the past. Id. at 76 (**Exh. 2**). He was informed that there were no new blockages and that he "was all right" and released. He had no pain or shortness of breath and felt good. He had a normal sinus rhythm. N. Scala at 77, 79 (**Exh. 2**); see **Exhibit 4**.

On January 5, 2001, Mr. Scala was seen at Mid-State Medical Center complaining of dizziness. He felt palpitations and an irregular heart beat but had no chest pain, shortness or breath or nausea. His history of atrial fibrillation was noted, he was treated, and released the same day. See **Exhibit 31**.

According to Mr. Scala, the alcohol allegedly provided to him on the plane caused him to turn bright red, have the sweats, angina and to be sick for three weeks. N. Scala depo. at 112 (**Exh. 2**).

> Q. So what you attribute to the alcohol was you turned bright red, you had the sweats, you had the angina attack or pain, and that you were sick for three weeks. Do I have it right?
>
> A. Right.
>
> Q. Is there any other way or any other injury or pain or discomfort of any type that you attribute to the alcohol you had?
>
> A. None.

N. Scala Depo. at 112 (**Exh. 2**).

Mr. Scala and his wife flew to St. Martin in February 2001 and stayed for four weeks. P. Scala depo. at 56 (**Exhibit 3**).

Noteworthy, is that no physician ever told Mr. Scala either prior or after this incident he could not have alcohol. P. Scala depo. at 9-10, 11 (**Exh. 3**); N. Scala depo. at 24-25 (**Exh. 2**). He just did not like it. N. Scala depo. at 24-25 (**Exh. 2**); P Scala depo. at 11 (**Exh. 3**) (no physician told him he could not drink and if he wanted to he could). In fact, Mr. Scala testified that his cardiologists have suggested that he drink alcohol, like wine as it might be beneficial. N. Scala depo. at 25 (**Exh. 2**). He testified they kept telling him to try it. Id. at 102. (**Exh. 2**).

In fact, sometime after the incident and within the last year Mr. Scala sipped his wife's alcoholic drink (vodka and tonic) a couple of times. P. Scala depo. at 9-10 (**Exh. 3**).

In addition, as part of the ongoing care for his underlying heart condition which he has had since 1983, Mr. Scala wore a Holter monitor in January 2001, where he reported he drank "a glass of merlot". See **Exhibit 5**. [2]

Prior to the incident in December 2000, which is the subject of the action, Mr. Scala received regular care and treatment for his underlying heart condition.

Mr. Scala had at various time bouts of chest pain prior to the incident and since and they were not caused or attributed to any alcohol. P. Scala depo. at 59-60 (**Exh. 3**).

Mr. Scala had previously suffered various occasions where he developed atrial fibrillation and they were not caused or attributed to any alcohol. P. Scala depo. at 59-60 (**Exh. 3**).

Mr. Scala underwent initial by-pass surgery for his heart in mid-1983. The surgery was needed due to severe and advanced coronary artery disease. See **Exhibit 6**.

Mr. Scala was hospitalized in or about August-September, 1985 for chest pain. He underwent a work-up including stress test and was released on his usual medicine regimen. See **Exhibit 7**.

Mr. Scala underwent work-up and stress testing in October, 1986 due to complaints of chest pain. See **Exhibit 8**.

[2] Mr. Scala was regularly asked to wear a Holter monitor which is a device to measure the rhythms of the heart while the patient conducts normal activities and records them in a log which is then provided to the physician to evaluate. P. Scala depo. at 68-70 (**Exh. 3**); N. Scala depo. at 100-101 (**Exh. 2**).

Mr. Scala was required to be seen on an emergency basis in November, 1989 due to chest pain after exercise. The pain was noted to have been "provoked" by walking. See **Exhibit 9**.

Mr. Scala underwent a catheterization procedure at St. Francis Hospital in January, 1990. The procedure was in follow-up to prior chest pain and nausea during a regular stress test. See **Exhibit 10**. The catheterization procedure confirmed "triple vessel coronary artery disease with total occlusion of the left descending artery … and right coronary artery." Id. He was to continue to be treated medically, including the need to lower his cholesterol. Id.

In March, 1990, Mr. Scala was noted to have anginal episodes after walking. See **Exhibit 11**.

In July, 1999, Mr. Scala was seen on a semi-urgent basis due to "subxiphoid [chest] pain" while playing tennis and underwent a stress test. See **Exhibit 12**.

In October, 1992, Mr. Scala was noted to develop anginal episodes when he plays tennis. See **Exhibit 13**.

In April, 1993, Mr. Scala was seen on a semi-urgent basis because of chest pain and was noted to have "a clear-cut history of exertional angina," which episodes were increasing including when walking. See **Exhibit 13**.

On May 3, 1993, Mr. Scala underwent left heart catheterization, coronary angiography, and left ventriculography. See **Exhibit 14**. The procedure was the result of Mr. Scala complaining of worsening angina and his recent admission to the hospital for an episode of angina. Coronary atherosclerotic heart disease was noted and confirmed with the findings unchanged from those in 1990 and Mr. Scala was to continue with his ongoing medical therapy. Id.

In January, 1995, Mr. Scala was noted to have "tried stopping Cardizem on one occasions, but his angina returned" and he was told "not to gamble with activities such as this or he will end up with a heart attack one day." See **Exhibit 15**.

In April, 1995, Mr. Scala was seen and noted to have "been developing angina with brisk walking" and underwent a stress test. See **Exhibit 16**.

In May, 1995, Mr. Scala was noted to have "dull chest discomfort and some associated nausea" with concern about it representing "the possibility of balanced disease." See **Exhibit 17**.

In June, 1995, Mr. Scala was hospitalized and underwent left heart catheterization, selective right and left coronary angiography, saphenous vein bypass graft and left ventriculography. The procedure was due to worsening angina and "severe three vessel atherosclerotic coronary disease." See **Exhibit 18**.

In July, 1995, Mr. Scala complained of an episode of palpitations and was suspected to have had an episode of paroxysmal atrial fibrillation. See **Exhibit 19**.

Beginning in July, 1997 through October 1997, Mr. Scala developed atrial fibrillation. He was likewise noted to have chest pain and shortness of breath. He was provided Coumadin and cardio converted back to normal sinus rhythm in October, 1997. In September, 1997 he complained of episodes of waking up in the early morning and gasping for air. See **Exhibit 20**.

In March and April 1998, Mr. Scala developed atrial fibrillation and was complaining of anginal type pain. See **Exhibit 21**.

In June and August, 1999, Mr. Scala developed and continued to follow-up for his atrial fibrillation. See **Exhibit 22**.

Mr. Scala was admitted for atrial fibrillation and cardio converted in June, 1999. See **Exhibit 23**.

In October, 1999, it was noted that Mr. Scala was 261 pounds and stopped taking Lanoxin with it further noted that he "wishes to take the gamble that the atrial fibrillation may come back but is taking no medications." See **Exh. 22**.

In August, 2000, Mr. Scala developed atrial fibrillation and angina. He was hospitalized for three days at St. Francis Hospital and underwent cardiac catheterization which "revealed a marked advance in native vessel disease." He was discharged to undergo anti-coagulation for one month prior to cardioversion. See **Exhibit 24**.

On January 18, 2001, a month after the incident, it was noted that Mr. Scala drank a glass of merlot while wearing a Holter monitor. See **Exh. 5**.

In August, 2001, Mr. Scala was seen due to complaints of dizziness and irregular heat beat. He was treated and released. See **Exh. 6**.

In May, 2002, Mr. Scala was admitted for two days for a cardiac catheterization. It was noted that he "has a long-standing history of arteriosclerotic cardiovascular disease with previous coronary artery by-pass surgery twice. He had done well until several days prior to admission, when he developed several bouts of prolonged angina, associated with walking in the cold." The testing revealed "progression of his small native vessel disease." See **Exhibit 26**.

In August, 2002, it was noted that Mr. Scala's weight, abnormal lipids and diabetes was "accelerating his arthrosclerosis quite rapidly." See **Exhibit 27**.

## THE PROCEDURE AND CLAIMS

Plaintiff initiated this action on or about March 27, 2002 in state court. American subsequent removed the action to this court pursuant to both diversity and federal question jurisdiction.

American moved for judgment on the pleadings on or about July 19, 2002. The court (Arterton, J.) denied the motion on March 13, 2003.

On May 9, 2003, The court set down a Scheduling Order establishing, *inter alia*, the following:

- Plaintiff's designation of experts by August 15, 2003 with report;
- Defendant's designation of experts by October 15, 2003 with report;
- All fact discovery completed by November 15, 2003; and
- All dispositive motions filed by November 15, 2003.

Plaintiffs did not designate any expert by the deadline and have not ever designated any expert or provided an expert report.

American designated an expert Dr. Kluger, a cardiologist, on or about October 14, 2003 and provided the required expert report. See **Exhibit 28**.

This dispositive motion followed.

## ARGUMENT

### I. Summary Judgment Standard

Summary judgment is appropriate only when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(C); Hermes Int'l v. Lederer de Paris Fifth Ave., Inc., 219 F.3d 104, 107 (2d Cir. 2000). The moving party bears the burden of showing that no genuine factual dispute exists. Carlton v. Mystic Transp., Inc., 202 F.3d 129, 133 (2nd Cir. 2000) (citing Gallo v.

Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1223 (2nd Cir. 1994)). In assessing the record to determine if such issues exist, all ambiguities must be resolved and all inferences drawn in favor of the party against whom summary judgment is sought. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986); Heilwell v. Mount Sinai Hosp., 32 F.3d 718, 721 (2d Cir. 1994). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate infererences from the facts are jury functions, not those of a judge." Anderson, 477 U.S. at 255. When reasonable persons applying the proper legal standards could differ in their responses to the questions raised on the basis of the evidence presented, the question is best left to the jury. Sologub v. City of New York, 202 F.3d 175, 178 (2nd Cir. 2000).

Once the moving party has met its burden, in order to defeat the motion the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 255, and present such evidence as would allow a jury to find in his favor, Graham v. Long Island R.R., 230 F.3d 34, 38 (2nd Cir. 2000). A party may not rely "on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." Lipton v. The Nature Company, 72 F.3d 464, 469 (2nd Cir. 1995) (quoting Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2nd Cir. 1986)). Additionally, a party may not rest on the "mere allegations or denials" contained in his pleadings. Goenaga v. March of Dimes Birth Defects Found., 52 F.3d 14, 18 (2d Cir. 1995). See also Ying Jing Gan v. City of New York, 996 F.3d 522, 532 (2nd Cir. 1993) (holding that party may not rely on conclusory statements or an argument that the affidavits in support of the motion for summary judgment are not credible).

## II. The Warsaw Convention Governs Plaintiff's Action

The Warsaw Convention is a comprehensive international treaty governing liability in "all international transportation of persons, baggage or goods." 49 U.S.C. §40105, Article 1(1). Where transportation is "international," as defined in Article 1(2), the Warsaw Convention applies and governs any claim for damages. The Warsaw Convention, in turn, sets out an array of liability rules pertaining to personal injuries (Article 17), baggage or goods loss, damage, or destruction (Article 18) and damage occasioned by delay (Article 19). The two preeminent goals and purposes of the Convention were to establish uniformity as to liability and limit the liability of air carriers. El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng, 525 U.S. 155, 169-70 (1999); In re: Air Disaster at Lockerbie, Scotland, 928 F.2d 1267, 1270 (2nd Cir. 1991); see also Langadinos v. American Airlines, Inc., 199 F.3d 70, n.2 (1st Cir. 2000); McCarthy v. Northwest Airlines, Inc., 56 F.3d 313, 316 (1st Cir. 1995); McDonald v. Air Canada, 439 F.2d 1402, 1405 (1st Cir. 1971).

Here, there is no dispute that the Warsaw Convention applies and provides the exclusive means to any potential relief.

## III. American Is Entitled To Summary Judgment As The Plaintiff's Failed Above To Establish That The Alleged Accident Caused Any Injury

Article 17 of the Warsaw Convention sets forth the circumstances under which an international carrier may be liable for injuries to passengers. It provides:

> The carrier shall be liable for damage sustained in the event of death or wounding of a passenger or any bodily suffered by a passenger, if the accident which caused the damage so sustained took place on board the aircraft or in the course of any of the operations or embarking or disembarking.

As set forth above, in order for a plaintiff to prevail under Article 17 he or she must demonstrate that (1) there was an unexpected and unusual event external to the passenger; (2) which proximately caused (3) a bodily injury. See Air France v. Saks, 470 U.S. 392, 40, 105 S. Ct. 1338 (1985) (causation required); Langadinos v. American Airlines, Inc., 199 F.3d 70 (1st Cir. 2000) (essential element under Article 17 is proximate cause); Potter v. Delta Airlines, 98 F.3d 881, 884 (5th Cir. 1996) (plaintiff must demonstrate causation); Gotz v. Delta Airlines, 12 F. Supp. 2d 199, 201 (D. Mass. 1998) (same).

In addition, it is black letter law that expert testimony is needed as to causation where the issue is beyond the field of ordinary knowledge of jurors. See Barnes v. Kaplan, 202 F.3d 150, 159-160 (2nd Cir. 1999). Indeed, "expert medical testimony is usually required to show the cause of an injury or disease because the medical effect on the human system of the infliction of injuries is not generally within the sphere of common knowledge of the lay person. …" Sherman v. Bristol Hospital, Inc., 79 Conn. App. 78, 89, 828 A.2d 1260 (App. Ct. 2003).

In Sousa v. SATA Air Acores, for instance, Judge Lindsay of the Federal District Court of Massachusetts recently entered summary judgment for an airline under the Warsaw Convention on the issue of causation and facts similar to those here. Specifically, in Sousa, the passenger plaintiff claimed he blacked out and fell injuring himself after a flight attendant allegedly refused to provide him with sugar water which he had repeatedly requested. See **Exhibit 30**. The court entered summary judgment for the airline stating:

> The plaintiffs claim that because of an in flight fall he injured his back. The plaintiffs, however, have not offered expert medical testimony to establish a causal connection



912442v1

> between the fall and the claimed injury. Courts often require such expert evidence to demonstrate a causal connection between an incident and an injury, especially when, as here, the injury and its cause are not obvious or apparent to the average lay person.

Sousa at p. 2 (**Exh. 30**).

Indeed, similar to here, the court further stated that "[t]he absence of any medical testimony to support the plaintiffs' position is particularly problematic in this case, because the defendants' motion was accompanied by extensive medical records indicating that Mr. Sousa had pre-existing back problems." Sousa at p. 2 (**Exh. 30**).

The Second Circuit has also recently recognized this principle in affirming a district court's determination that expert medical testimony was needed on the issue of causation where it was claimed that certain physical contact caused a miscarriage. Barnes v. Kaplan, 202 F.3d 150, 159-160 (2nd Cir. 1999).

Here, plaintiff failed to proffer and designate any expert witness and testimony in response to this Court's scheduling order. See **Exhibit 28**. Pursuant to this order, the plaintiff had until September 15, 2003 to designate any expert and failed to do so. Indeed, he never designated any expert, nor could he.

Without expert testimony that the plaintiff's alleged "gulp" or "mouthful" of the vodka and cranberry juice caused him a physical bodily injury, plaintiff's claim fails as a matter. Whether or not such a "gulp" or "mouthful" could cause any possible bodily injury is not with the ken of a jury or fact finder's common knowledge. Indeed, according to Mr. Scala, his claim of injury is that the "gulp" or "mouthful" caused him to be "sick for three weeks", made him turn red at the time, caused him to sweat, and have angina attack and pain.

> Q. So what you attribute to the alcohol was you turned bright red, you had the sweats, you had the angina

attack or pain, and that you were sick for three weeks. Do I have it right?

A. Right.

Q. Is there any other way or any other injury or pain or discomfort of any type that you attribute to the alcohol you had?

A. None.

N. Scala depo. at 112 (**Exh. 2**).

Whether there is (or could ever possibly be) a medical/chemical connection absolutely requires expert medical testimony. There must be a reliable, competent medical opinion expressed to a reasonable degree of medical certainty that the "gulp" caused the sweats, turning red, angina and shortness of breath. This is especially compelling here where it is undisputed Mr. Scala had long-standing coronary heart disease and was repeatedly hospitalized both before and after the incident for angina, chest pain, shortness of breath, dizziness, nausea and atrial fibrillation.

Unlike plaintiff, American did abide by this court's scheduling order and both designated an expert and provided the mandatory report. See **Exhibit 28**. As set forth in the designation, American relies upon the opinion of Dr. Jeffrey Kluger, a board certified cardiologist and Professor of Clinical Medicine. He has clearly opined to a reasonable degree of medical certainty and based on his education, training and experience and after detailed review of medical records and claims of Mr. Scala, that the "gulp" or "mouthful" of the cranberry and vodka drink on December 15, 2000 "did not cause Mr. Scala any damage, disability, injury or subsequent need for medical care." According to Dr. Kluger, "[t]he care and treatment obtained or provided to Mr. Scala following the incident was for the same long-standing conditions he had prior to the alleged incident and was not the result of the alcoholic beverage." Id.

Further, the court cannot ignore the undisputed fact that no physician had ever told Mr. Scala that he could not have alcohol. According to both Mr. and Mrs. Scala, Mr. Scala had tried alcoholic drinks on occasion but simply did not like it. At no time prior to the incident, did any physician tell him that drinking alcohol, a "gulp" or "mouthful" no less, would anyway possibly risk causing him any bodily harm. Mr. Scala, in fact, testified that his cardiologists had repeatedly suggested to him that he drink alcohol like wine as it might be helpful. Also, within one month of the incident, Mr. Scala had a "glass of merlot" and within the last year (after the incident) took a taste from his wife's "vodka and tonic" when they had friends over. If Mr. Scala had never been advised by his physicians prior to the incident and/or has had alcoholic drinks or at least sips since, American cannot be held liable for the alleged miss-service of the drink in December, 2000. The court cannot and should not condone such a claim.

Finally, the need for competent and reliable expert testimony is all the more mandated here as the Warsaw Convention was aimed to limit the scope of a carrier's liability. See McCarthy, 56 F.3d at 316 (restraint needed in interpretation of Article 17). Not only must a plaintiff establish that the injury resulted from an unusual or unexpected event constituting an abnormal operation of the aircraft (see Gotz v. Delta Airlines, Inc., 12 F. Supp. 2d 199, 205 (D. Mass. 1998)), but he must also establish that the injury did not result from the particular or peculiar internal medical condition of the passenger. Courts have routinely held that an injury resulting from the passengers' own peculiar or particular medical condition are not actionable. In MacDonald v. Air Canada, for instance, the First Circuit held that a passenger's fall while waiting for her suitcase at the baggage area was not an accident as it was equally reasonable to support that some

internal condition resulted in the fall. 439 F.2d 1402, 1405 (1st Cir. 1971). See also Farra v. American Airlines, Inc., 2000 U.S. Dist. LEXIS 8824 (E.D.. Pa. 2000) (airline carrier not liable under Article 17 for failure to serve meal early as requested as alleged failure of such meal service is not unusual or unexpected and as illness was the result of plaintiff's pre-existing medical condition); Abramson v. Japan Airlines Co., Ltd., 739 F.2d 130 (3rd Cir. 1984) (failure of airline to accommodate passenger's request to lie down to administer self help remedy for pre-existing paraesophageal hiatal hernia not actionable); Krys v. Lufthansa German Airlines, 119 F.3d 1515 (11th Cir. 1997) (alleged aggravation of heart attack not actionable under Article 17); Fischer v. Northwest Airlines, Inc., 623 F. Supp. 1064 (D.C. Ill. 1985) (same); Rajcooar v. Air India Ltd., 89 F. Supp. 2d 324, 328 (E.D. N.Y. 2000) (alleged aggravation of pre-existing injury not actionable); Ronai v. Delta Air Lines, Inc., 2000 U.S. Dist. LEXIS 21064 (E.D. N.Y. 2000) (same).

Plaintiff failed to designate any expert testimony on causation as required by the court's order and as to plaintiff's claim of bodily injury and cannot make out an essential element of his claim mandating the entry of summary judgment.

---

[5] The Supreme Court in Saks cited and relied upon McDonald in its decision. 470 U.S. at 405.

## CONCLUSION

Based on the foregoing reasons, the defendant, American Airlines, Inc. respectfully requests that its Motion for Summary Judgment be **ALLOWED**

Respectfully Submitted,
The Defendant
AMERICAN AIRLINES, INC.
By their Attorneys,

By:____________________________________

Darren Sinofsky, Federal Bar No. CT21118
Morrison, Mahoney & Miller, LLP
One Constitution Plaza, 10th Floor
Hartford, CT 06103
(860) 616-4441

By:____________________________________

Tory A. Weigand, Pro Hac Vice
Morrison, Mahoney & Miller, LLP
250 Summer Street
Boston, MA 02210-1181
(617) 439-7500

**CERTIFICATION**

This is to certify that a copy of the foregoing has been mailed, postage prepaid to the following counsel of record on this ___ day of ________________, 2003.

John F. Wynne, Jr., Esq.
Buckley & Wynne
685 State Street
New Haven, CT 06510

_________________________________
Darren E. Sinofsky